(823 P.2d 823)

No. 66,336

STATE OF KANSAS, *Appellant*, v. MARILYN MARSH, *Appellee*.

—

Opinion filed December 31, 1991.

*Camille Nohe*, assistant attorney general, and *Robert T. Stephan*, attorney general, for the appellant.

*Benjamin C. Wood*, of Overland Park, for the appellee.

Before LEWIS, P.J., BRAZIL, J., and BILL D. ROBINSON, JR., District Judge, assigned.

LEWIS, J.: This is an appeal by the State of Kansas from an order suppressing evidence. The evidence was seized in a search authorized by an emergency administrative order issued by the Kansas Animal Health Department. In issuing the order, the State was acting pursuant to the Animal Dealers Act (ADA), K.S.A. 47-1701 *et seq.*

The context in which this issue comes before us is that of a criminal prosecution. The defendant is charged with one count of cruelty to animals and one count of failure to comply with the ADA. In pursuing the prosecution, the State sought to introduce evidence seized from the defendant's premises pursuant to the emergency administrative order. The trial court held such evidence to be inadmissible. It did so by holding that the evidence was obtained in violation of the defendant's right to be free from unreasonable searches and seizures. The State appeals that ruling. We affirm the decision of the trial court.

Marilyn Marsh (defendant) lived on a farm in rural Franklin County. Apparently, her farm premises consisted of a dwelling house, several dog kennels or pens, barns, and other outbuildings. There is no indication as to the total area occupied by the defendant, nor as to that part of the premises that would have been within the "curtilage" of her dwelling.

Although she was not licensed under K.S.A. 1990 Supp. 47-1702 and K.S.A. 1990 Supp. 47-1722(a) of the ADA, she was apparently operating as an animal dealer within the meaning of the ADA. Specifically, the defendant dealt in dogs, or, at the very least, had a great fondness for dogs. The record indicates that, upon her premises, the defendant was in possession of approximately 130 dogs, primarily of the Akita breed.

The defendant's premises first came to the attention of the Animal Health Department on July 9, 1990. On that date, a State animal inspector, acting on the basis of oral and written complaints and without the knowledge and consent of the defendant, inspected the defendant's premises. At this time, it was observed that the defendant had many dogs who appeared to be in fairly decent condition. However, this inspection noted that the animal

pens, etc., were not being kept in the required state of cleanliness.

In early October 1990, another "inspection" was conducted. Again, the permission of the defendant was neither sought nor obtained. The premises were clearly posted "no trespassing or admittance." This inspection revealed a deterioration in the condition of the animals and the premises. The condition of both the dogs and the premises is described as having been "deplorable." In addition to checking the dog pens, barns, and outbuildings, the inspector looked into a window of the defendant's home and observed three or four dogs in the dwelling.

The last inspection indicated that the defendant appeared to be raising, breeding, and selling dogs in such a volume as to be subject to the ADA. Despite this fact, it was determined that the defendant was not licensed and had not filed an application for a license. There is no indication in the record that the defendant was aware of the requirements of the law insofar as licensing is concerned.

After the second inspection, the Kansas Animal Health Department consulted its counsel with a view to taking action against the defendant. After consulting with the department, the attorney for the department drafted an emergency impoundment order. This order was presented to the acting livestock commissioner for his signature. The order was signed on October 5, 1990, by Wilbur Jay, a veterinarian, who was the acting livestock commissioner. The order was prepared and issued pursuant to K.S.A. 1990 Supp. 47-1707(c) and K.S.A. 77-536(a)(2). On the basis of the authority granted by this order, the State was authorized to seize and impound the defendant's dogs. The evidence sought to be admitted against the defendant was obtained under the authority of the emergency administrative order. No search warrant was sought or issued.

On October 5, 1990, a task force of 30 people and 8 or 9 trucks invaded the defendant's farm. The defendant was not home, she was not notified that the invasion was coming, and her consent was not obtained. Acting under the authority of the emergency order, the task force occupied the defendant's premises for approximately 13 hours. During that time, they seized, tranquilized, and hauled off all of the defendant's dogs. In the process, they

found that the dwelling house in which the defendant lived was locked. Upon this discovery, they broke in the door, violated the sanctity of the defendant's home, and hauled off all of the dogs located inside that home.

After the operation had been ongoing for some six to six and one-half hours, the defendant returned home. Upon observing her premises literally crawling with law enforcement and animal health agents, she asked them to leave. They refused to heed her request and continued their labors without her consent until approximately 2 a.m. the next morning.

After the search was completed and the defendant's dogs were seized and impounded, the attorney general filed criminal charges against the defendant. This appeal is from rulings made in the prosecution of those charges.

We are asked to determine if the trial court erred in suppressing all evidence obtained during the search of the defendant's premises on October 5, 1990. As we approach this issue, we wish to emphasize that the search and seizure in question were not accomplished with the aid or benefit of a search warrant. This was a warrantless search conducted under the authority granted by the emergency order of the acting livestock commissioner.

We deem it important to note what is *not* involved in our decision. We are not asked or required to determine the constitutionality of the ADA or any part thereof. Accordingly, we do not do so. We are not asked and are not required to decide whether evidence obtained in the manner outlined in this opinion would be admissible in a civil proceeding or in an administrative proceeding to revoke a license or impose a civil fine. We express no opinion on that issue. To the extent that language in this opinion can be inferred to shed light on how we would decide either issue mentioned above, such language can be considered as nothing more than dicta.

The sole question this court is confronted with is whether evidence obtained under the emergency administrative order and the ADA is admissible in the criminal proceedings filed against the defendant. The trial court held that it was not admissible. Our review indicates that the trial court's position was correct.

The United States Supreme Court has permitted warrantless searches of commercial establishments conducted under administrative orders or regulations. These searches are permitted for a variety of reasons as an exception to the search warrant requirements of the Fourth Amendment. Such searches are permitted only in the event that certain elements exist and the requirements of the Fourth Amendment are comported with. See *Donovan v. Dewey*, 452 U.S. 594, 69 L. Ed. 2d 262, 101 S. Ct. 2534 (1981); *United States v. Biswell*, 406 U.S. 311, 32 L. Ed. 2d 87, 92 S. Ct. 1593 (1972); *Colonnade Corp. v. United States*, 397 U.S. 72, 25 L. Ed. 2d 60, 90 S. Ct. 774 (1970).

The most recent and, we believe, the controlling case on the subject is that of *New York v. Burger*, 482 U.S. 691, 96 L. Ed. 2d 601, 107 S. Ct. 2636 (1987). That case involved the question of whether the warrantless search of an automobile junkyard, pursuant to a statute authorizing such a search, fell within the exception to the warrant requirement for administrative inspections of pervasively regulated industries.

The court in *Burger* reviews its prior decisions on the subject, which indicate that there is a reduced expectation of privacy by the owner of commercial premises in a "closely regulated" industry. This reduced expectation of privacy, as well as other factors, has permitted warrantless searches pursuant to administrative orders under certain narrow circumstances. The court then sets out the requirements for a warrantless inspection to be deemed reasonable:

"This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made. See *Donovan v. Dewey*, 452 U.S., at 602 ('substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines'); *United States v. Biswell*, 406 U.S., at 315 (regulation of firearms is 'of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders'); *Colonnade Corp. v. United States*, 397 U.S., at 75 (federal interest 'in protecting the revenue against various types of fraud').

"Second, the warrantless inspection must be 'necessary to further [the] regulatory scheme.' *Donovan v. Dewey*, 452 U.S., at 600. For example, in *Dewey* we recognized that forcing mine inspectors to obtain a warrant before every inspection might alert mine owners or operators to the impending

inspection, thereby frustrating the purposes of the Mine Safety and Health Act—to detect and thus to deter safety and health violations. *Id.*, at 603.

"Finally, 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' *Ibid.* In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. See *Marshall v. Barlow's, Inc.*, 436 U.S., at 323; see also *id.*, at 332 (Stevens, J., dissenting). To perform this first function, the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.' *Donovan v. Dewey*, 452 U.S., at 600. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be 'carefully limited in time, place, and scope.' *United States v. Biswell*, 406 U.S., at 315." 482 U.S., at 702-03.

The trial court in the instant matter found that the first two prongs of *Burger* were satisfied but that the third prong was not. We agree.

We believe that there is a substantial government interest in regulating the operation of "puppy mills" in the State of Kansas. The first prong of *Burger* is satisfied.

We further hold that a warrantless inspection would be "necessary to further the regulatory scheme." The Supreme Court, in *Donovan v. Dewey*, 452 U.S. at 603, reasoned that forcing a mine inspector to obtain a warrant before every inspection might alert mine owners or operators to the impending inspection, thereby frustrating the purposes of the mine safety and health act. While we do not equate regulating the dog business with the mine safety and health act, we nonetheless are convinced that warrantless inspections might very well be necessary to further the regulatory scheme in the industry. The second prong of *Burger* is satisfied.

However, the third requirement is that the statute or administrative order under which the search is conducted must comport with basic Fourth Amendment requirements. Most important, in our opinion, is the requirement that the administrative order must be "carefully limited in time, place, and scope." We are not convinced that the order issued in this case or the statute that authorized it satisfies the third prong of the *Burger* decision.

The *Burger* decision explained why it felt the third prong of its test had been satisfied by the New York law under which the inspection was made:

"Third, § 415-a5 provides a 'constitutionally adequate substitute for a warrant.' [Citation omitted.] The statute informs the operator of a vehicle dismantling business that inspections will be made on a regular basis. [Citation omitted.] Thus, the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute. [Citation omitted.] Section 415-a5 also sets forth the scope of the inspection and, accordingly, places ·the operator on notice as to how to comply with the statute. In addition, it notifies the operator as to who is authorized to conduct an inspection.

"Finally, the 'time, place, and scope' of the inspection is limited, *United States v. Biswell*, 406 U.S., at 315, to place appropriate restraints upon the discretion of the inspecting officers. See *Donovan v. Dewey*, 452 U.S., at 605. The officers are allowed to conduct an inspection only 'during [the] regular and usual business hours.' § 415-a5. The inspections can be made only of vehicle-dismantling and related industries. And the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as 'any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.' " 482 U.S. at 711-12.

Neither the statute in question nor the emergency administrative order pass muster under the *Burger* rationale. We have already noted that the first two prongs of the *Burger* test can arguably be satisfied. However, the third element of that test is totally lacking.

The third requirement of *Burger* indicated that a warrantless administrative search would be permitted if the inspection program in question: (a) advised the owner of the commercial premises that the property will be subject to periodic inspections undertaken for specific purposes; *and* (b) the discretion of the inspecting officers is carefully limited as to the time, place, and scope of the inspection.

It is questionable, in this case, whether the owner of the dogs was aware that her property was subject to periodic inspections. K.S.A. 1990 Supp. 47-1709(b) provides for inspections· of a *licensed* dealer to take place at least once a year if that dealer is also federally inspected; otherwise the state inspection is to occur twice a year. It appears that a licensed animal dealer under the act is advised that his property will be subject to periodic in-

spections. There may be some factual question as to whether the State has the necessary inspectors to provide those periodic inspections, but that appears to be a question of fact. However, to the extent that the statute must make an owner aware of periodic inspections, it appears to do so.

The problem that arises on the particular facts before this court is that this defendant *was not a licensed dealer*. There is nothing in the record to indicate that this particular defendant was aware of the inspection requirement or was even aware of the fact that she was required to be licensed under state law. It seems doubtful to us that, under these facts, it could be concluded that the defendant was aware that she was subject to periodic inspections.

It can be argued that "ignorance of the law is no excuse." It is obvious that, had this defendant complied with the State laws and been licensed as required, she would not have been ignorant of the periodic inspection requirements. However, we deal here with the right to be free from unreasonable searches and seizures guaranteed to us by both the United States and Kansas Constitutions. At a suppression hearing, the burden of proof is on the prosecution to show that the search and seizure was lawful. *State v. Pearson*, 234 Kan. 906, 920, 678 P.2d 605 (1984); *State v. Chiles*, 226 Kan. 140, 145, 595 P.2d 1130 (1979). While we might conclude that the statutory scheme in effect in the State of Kansas advises licensed animal dealers that their property is subject to periodic inspection, there is simply no evidence in the record that that scheme was sufficient to advise the defendant, who was unlicensed. The record in the instant matter does not show that this defendant was aware that her premises were subject to any kind of inspection whatsoever. Under these facts, we conclude that the statutory scheme did not advise this particular owner of commercial property that her property was subject to periodic inspections.

However, even though we hold that this defendant was not aware of the State's scheme providing for periodic inspections of licensed dealers, we need not rest our decision on that basis. Neither the statute nor the emergency administrative order involved in the instant matter limited the discretion of the inspectors as to time, place, and scope of the inspection. The failure to so limit the search renders it unreasonable as a matter of law.

The pertinent part of the emergency administrative order under which this search took place reads as follows:

"IT IS THEREFORE ORDERED AND DECREED by the Commissioner of the Kansas Animal Health Department that pursuant to K.S.A. 1989 Supp. 47-1707(c), all dogs in the possession, custody; and care of respondents [*sic*] shall be seized and impounded until such time that a formal hearing is held on this matter."

The search and seizure ordered was issued pursuant to K.S.A. 1990 Supp. 47-1707(c), which reads as follows:

"Whenever the commissioner has reasonable grounds to believe that a person required to be licensed or registered under this act has failed to comply with or has violated any provision of this act or any rule and regulation adopted hereunder and that the health, safety or welfare of animals in such person's possession, custody or care is endangered thereby, the commissioner shall seize and impound such animals using emergency adjudicative proceedings in accordance with the Kansas administrative procedure act."

It is obvious that neither the statute nor the emergency administrative order make any effort to limit the time, place, and scope of a warrantless search. Indeed, a review of the facts concerning this search clearly indicates that there were no limits. The searchers arrived at one o'clock in the afternoon and continued their efforts unabated for the next 13 hours. Not only were the defendant's outbuildings and pens subjected to a search, her dwelling house was broken into and searched by the law enforcement officers, and dogs were removed therefrom.

Where inspections are authorized, but no rules exist governing the procedures that inspectors must follow, the Fourth Amendment restrictions apply. *State v. Williams*, 8 Kan. App. 2d 14, 18, 648 P.2d 1156, *rev. denied* 231 Kan. 802 (1982). Under the ADA, the secretary was to adopt rules and regulations relating to inspections of licensed or registered premises, investigation of complaints, and the seizure and impoundment of animals. We have reviewed the Kansas Administrative Regulations insofar as they apply to animal welfare. See K.A.R. 9-13-1 *et seq*. Our review of the regulations in effect at the time of the search does not reveal any limitation on the time, place, and scope of a search and seizure operation to be conducted under the ADA. In fact, testimony in this particular action by one of the inspectors in-

dicated that the inspectors believed they had unlimited discretion to decide when and where to inspect.

We conclude that there were no limits on the time, scope, or place of the search undertaken or of any search and seizure conducted in this case under the statutes authorizing inspections and seizures. The administrative and statutory scheme in place in the State of Kansas allows a search and seizure to take place when the livestock commissioner has "reasonable grounds" to believe that the statutes have been violated. The seizure statute says nothing about where the seizures may be made. It says nothing about when they may be made. There was no limitation placed on the scope of this particular search and seizure operation, nor do the statutes or administrative regulations place any limitation on the scope of the seizure operation.

We hold that, under the facts shown, the search and seizure operation undertaken on the defendant's premises did not comport with the requirements of the Fourth Amendment. The search and seizure operation was not limited by order, statute, or regulation as to time, place, and scope of the search. Such a limitation is required by the *Burger* decision for a warrantless search and seizure to be considered lawful and reasonable. As a result, we conclude that the search conducted in this action violated the defendant's right to be free from unlawful searches and seizures. We further hold that the trial court did not err in suppressing the evidence in the instant matter. It is axiomatic that any evidence obtained during an unlawful search and seizure is inadmissible in the prosecution of the defendant whose rights were violated by such search and seizure.

The State argues that a decision affirming the trial court will cripple the enforcement of the ADA. It bases its argument partially on the premise that a search warrant is not obtainable under our statute for a violation of administrative regulations. This argument lacks merit on the facts presented. In the instant matter, the defendant is charged with a crime, and a search warrant was certainly available to the regulatory officials if probable cause existed that the crime of cruelty to animals was taking place. Neither are we persuaded that the exigency of the situation, due to the condition of the animals, required prompt emergency action. If the proper steps are followed, we suspect that a search

warrant can be obtained in nearly the same time frame as it takes to obtain an emergency administrative order.

In addition to the decisions of the United States Supreme Court, there are decisions of sister states in accord with our holding in the present matter. In *Commonwealth v. Lipomi*, 385 Mass. 370, 432 N.E.2d 86 (1982), the Massachusetts Supreme Judicial Court dealt with an administrative inspection warrant which authorized the search of a retail pharmacy. The trial court had ordered the evidence suppressed. On appeal, the Massachusetts court affirmed the decision of the trial court, saying:

"The defendant argues that any authority to inspect granted by G.L. c. 13, § 25, is invalid, however, because the statute fails to impose appropriate limitations as to the time, place, and scope of such inspections. See, *e.g.*, *United States v. Biswell, supra* at 315; *Colonnade Catering Corp. v. United States, supra* at 77. In the absence of consent or exigent circumstances, the legality of a warrantless administrative inspection of a pervasively regulated business depends on the authority of a valid statute which carefully limits the inspection authority in time, place, and scope. [Citation omitted.]" 385 Mass. at 382.

The Massachusetts court found no such limitation in its regulatory scheme and, thus, concluded that evidence obtained as a result of the administrative search was not admissible. See also *Massage Foundation v. Nelson*, 87 Wash. 2d 948, 558 P.2d 231 (1976) (Statutes authorizing warrantless regulatory inspections of massage parlors failed to set forth adequate limitations on purpose, time, place, or scope of such inspections and were invalid.).

We think the situation presented to this court is analogous to that found in *Commonwealth v. Lipomi*. There certainly was no consent to the search in this case; indeed, the defendant asked the inspecting authorities to leave her premises, and they refused to do so. The State has shown us no indication that any exigent circumstances existed. Indeed, the proceedings which resulted in the issuance of the emergency administrative order were the result of two prior inspections, one of which dated back several months. The regulatory scheme in Kansas has no statute or regulation which carefully limits the inspecting authorities as to time, place, and scope. Accordingly, the evidence seized based on the authority of the emergency administrative order was obtained in

violation of the defendant's rights and cannot be admitted against her.

As we pointed out earlier, this decision relates only to the question of whether the evidence seized is admissible during the criminal trial of this defendant. However, in view of the comments made in this opinion, we would suggest that a legislative overview be taken to correct deficiencies pointed out in this opinion. We would also suggest that, in the future, a search warrant be obtained in situations such as that presented in this appeal. We have no doubt that, if the proper evidence is presented, such a warrant can be obtained to search for evidence of the crime of cruelty to animals. In proceeding in this fashion, we believe that the constitutional rights of our citizens will be better protected and, in addition, the likelihood of any evidence seized being admissible at a criminal trial will be greatly enhanced.

Affirmed.